**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

H & J LAND INVESTMENTS, INC.,
a Florida corporation, and BEAVER
STREET, INC., a Florida corporation
doing business as "SILVER FOX",

        Plaintiffs,

vs.                                       Case No. 3:13-cv-1174-J-34PDB

CITY OF JACKSONVILLE, a Florida
municipal corporation and
KEVIN L. JONES, individually,

        Defendants.

_____

## ORDER

    **THIS CAUSE** is before the Court on Plaintiffs' Complaint for Declaratory Judgment, Injunctive Relief and Damages (Doc. 1; Complaint); Defendant, Kevin L. Jones's, Motion to Dismiss Individual Claims with Prejudice (Doc. 18; Motion); and Plaintiffs' Response to Defendant Kevin L. Jones' Motion to Dismiss Individual Claims with Prejudice and Incorporated Memorandum of Law (Doc. 20; Response).

## I.   Background

    Plaintiffs H & J Land Investments, Inc., and Beaver Street, Inc., ("Plaintiffs") initiated this action on September 26, 2013, by filing the Complaint against Defendants City of Jacksonville ("City") and Kevin L. Jones ("Jones"), individually.  Beaver Street, Inc. ("Beaver Street") operates a "bikini bar" known as the "Silver Fox," at 3243 West Beaver Street, Jacksonville, Florida.  Complaint ¶ 10.  H & J Land Investments, Inc. ("H & J") owns the property upon which the Silver Fox is located, and Beaver Street rents the premises from H

& J.  Id. ¶¶ 9, 10.  On June 29, 2013, the City, through its Fire Marshal, Jones, conducted a "DART (Drug Awareness Response Team) raid" at the Silver Fox.  Id. ¶ 28.  Citing violations of the City of Jacksonville's Fire Code, Chapter 420, Jacksonville Municipal Ordinance Code ("JMOC"), Jones issued four Notices of Violation, one of which ordered Plaintiffs to "cease and desist business operation."  Id. ¶¶ 31-34.  Jones also ordered that electricity service to the establishment be terminated.  Id. ¶ 36.

### A.    The Complaint

Plaintiffs' claims stem from this June 29, 2013 DART raid.  In Count One of the Complaint, Plaintiffs contend that Chapter 420 of the JMOC is unconstitutional on its face and as applied because it violates Plaintiffs' due process rights, and, as such, seek declaratory and injunctive relief, as well as damages.  Id. ¶¶ 154-71.  In Count Two of the Complaint, Plaintiffs assert that Chapter 420 is facially unconstitutional as a prior restraint on speech, and unconstitutional as applied to them because it "has been used in practice to restrain Plaintiffs' speech."  Id. ¶¶ 172-199.  Next, in Count Three of the Complaint, Plaintiffs contend that "Defendants have employed Chapters 420 and 518 against Plaintiffs in an intentionally discriminatory fashion because Defendants object to the content of Plaintiffs' speech."  Id. ¶¶ 200-224.  Lastly, in Count Four of the Complaint, Plaintiffs assert a claim for violation of equal protection contending that "Defendants employ DART raids and issue closure orders against Plaintiffs' businesses, and other bikini bars," while relying upon "normal" code enforcement process with other, similarly-situated commercial establishments.  Id. ¶¶ 225-248.

In support of these claims, Plaintiffs allege that Jones has been employed by the Jacksonville Fire and Rescue Department for many years, that he has participated in many DART raids, and that he is personally aware that DART raids are used for pretextual and discriminatory purposes to target disfavored businesses, like the Silver Fox. Id. ¶¶ 141, 143. According to Plaintiffs, Jones "specifically decided not to follow the constitutional procedures set forth in Chapter 320" of the JMOC, which was reformed as a result of prior litigation between the Silver Fox, other Jacksonville bikini bars, and the City.  Id. ¶¶ 102 (p. 19), 100-104, 145.  Instead, Jones elected to proceed under the procedures set forth in Chapter 420 "because those procedures allowed him to close Plaintiffs' business and eject them from the premises without a meaningful way to challenge his decision."  Id. ¶¶ 146-47.  Additionally, Plaintiffs allege that Jones proceeded under "Chapter 420 because it served as a convenient means to harass Plaintiffs and to censor and disrupt their speech all in furtherance of the City's content-based and discriminatory efforts to ban or reduce adult entertainment in Jacksonville." Id. ¶ 148.  Further, they contend that Jones has refused to lift the closure order and restore electric power despite the fact that, according to Plaintiffs, the property "does not require a sprinkler system and otherwise poses no threat to the public health or safety."  Id. ¶ 149.  Finally, Plaintiffs allege that "Jones has intentionally violated Plaintiffs' First Amendment rights and Plaintiffs' rights of due process for ignominious and discriminatory purposes" and that "[a]ll of Jones' actions have been malicious, invidious, and in complete disregard of Plaintiffs' well-established constitutional rights."  Id. ¶ 151.

### B.      Procedural History

On October 22, 2013, Plaintiffs filed Plaintiffs' Motion for Preliminary Injunction and Incorporated Memorandum of Law (Doc. 7; Motion for Preliminary Injunction).  In the Motion, Plaintiffs asked the Court to enjoin "the City from issuing vacate orders or terminating electrical service under Chapters 420 and 518 of the City of Jacksonville Code of Ordinances, and that the vacate order issued to Plaintiffs be lifted with immediate restoration of utility services pending a determination on the merits of this litigation." Motion at 20.  On November 12, 2013, the Court held a hearing on the Motion for Preliminary Injunction, which was continued to November 15, 2013.  See Clerk's Minutes (Doc. 15).  At the continued hearing, the Court denied the Motion for Preliminary Injunction.  See November 18, 2013 Order (Doc. 17); see also Transcript of Continuation of Preliminary Injunction Hearing (Doc. 22; Hearing Transcript).

On November 21, 2013, Jones filed the instant Motion, in which he asserts a defense of qualified immunity,[1] see generally Motion at 1, and Plaintiffs responded, see generally Response.  Upon review of the Motion, the Response, and the applicable legal authority, the Court determines that the Motion is due to be granted.

## II.      Summary of the Arguments

In the Motion, Jones seeks dismissal of the Complaint arguing that he is entitled to qualified immunity from suit.  Motion at 1.  Jones asserts that because Plaintiffs' allegations involve actions within his official discretionary authority, "the burden shifts to Plaintiffs to show

---

[1] The City and Jones also filed Defendants' Answer and Affirmative Defenses on November 26, 2013 (Doc. 19; Answer).

that qualified immunity is inappropriate[,]" which requires alleging a constitutional violation by Jones, and showing that Jones departed from clearly established law of which he was aware or reasonably should have been aware. Id. at 6. To that end, Jones contends that Plaintiffs have not alleged that he violated a constitutional right because the Complaint simply shows that Jones "estimated that the club was well over capacity, and then entered a public place as part of a DART inspection and personally witnessed multiple Fire Code violations in the public areas of the club." Id. According to Jones, "[a]t most, Plaintiffs claim he was 'mistaken' about these violations" which is insufficient to overcome qualified immunity. Id. at 6-7. Additionally, Jones argues that "the law applicable to the actions of the Fire Marshal is certainly not so 'clearly established' as to make it obvious to him that simply by doing his job and issuing citations to a club open to the general public, he would be violating the club's constitutional rights." Id. at 8.

Plaintiffs oppose Jones's Motion on the grounds that "[a]n unavoidable factual dispute lies at the core of Defendant's Motion to Dismiss" because while Jones claims "he was applying the City's laws in a neutral fashion; Plaintiffs allege that the Defendant used those laws as a pretext for the purpose of closing Plaintiffs' business and that the real reason for the closure was Defendant's objection to the content of Plaintiffs' speech." Response at 3. Further, Plaintiffs argue that their "allegations also go far beyond any claim that Jones was merely 'substantively mistaken' or 'negligent'" in that they contend "Jones knew exactly what he was doing when he enforced pretextual violations with the intent and purpose of silencing Plaintiffs' speech." Id. at 5-6. Additionally, Plaintiffs assert that "the law is well-established under both of Plaintiffs' primary theories[,]" specifically "(1) that the Defendant violated

Plaintiffs' due process rights by declaring an emergency on a pretextual basis, thereby avoiding the usual due process protections; and (2) that the Defendant violated Plaintiffs' First Amendment rights by closing its business on pretextual grounds because of Defendant's objections to the content of Plaintiffs' speech."[2] Id. at 3-4.

## III.    Analysis

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"  Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003).  Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful."  Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler County, Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).  Additionally, "[b]ecause qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation,'" the Court is obligated to resolve questions of qualified immunity "'at the earliest possible stage in litigation.'"" Gonzalez v. Reno, 325 F.3d 1228, 1233 (11th Cir. 2003) (citations omitted).  Therefore, a district court should "grant the defense of qualified immunity

---

[2] In the Response, Plaintiffs do not address the claims alleged in the Complaint that Jones committed a First Amendment violation through application of Chapter 420 as a prior restraint (Count Two) or that Jones violated their rights under the Equal Protection Clause (Count Four).  As such, Plaintiffs have abandoned those claims.

at the motion to dismiss stage if the complaint 'fails to allege the violation of a clearly established constitutional right.'" Id. (citation omitted).

In order to be entitled to qualified immunity, an official must first establish that his conduct was within the scope of his discretionary authority.  See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007) (per curiam); Lee, 284 F.3d at 1194.  In this case, neither party disputes, and it appears that, Jones was acting within his discretionary authority when he participated in the DART raid at the Silver Fox on June 29, 2013.[3]  Indeed, Plaintiffs have not alleged any facts to support a contrary conclusion.  See generally Response. Consequently, the Court finds that Jones has satisfied this threshold burden, and the burden shifts to Plaintiffs to demonstrate that qualified immunity is not appropriate using the two-prong test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001).

Under Saucier, the first inquiry is, taken in the light most favorable to the non-moving party, "do the facts alleged show the officer's conduct violated a constitutional right?" Id.; see also Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott v. Harris, 550 U.S. 372, 377 (2007)).  If the court finds that a violation of a constitutional right has been alleged based on the plaintiff's version of the facts, then the next question is whether the right

---

[3] "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority.'" Jones v. City of Atlanta, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam).  Jones asserts that "[a]s Fire Marshal, [he] oversees and conducts inspections of buildings to detect fire hazards and enforce Fire Code regulations." Motion at 2.  "It is his duty to inspect, and he has the right to enter, any premises for inspection and in the event of an emergency." Id. (citing Fla. Stat. § 633.202 et. seq.; JMOC § 420.104-105).  Additionally, in the Complaint, Plaintiffs allege that Jones "is employed by the City of Jacksonville as Fire Chief and he acted in that capacity at all times material to this action." Complaint ¶ 13.  Thus, it is undisputed that inspecting commercial buildings and enforcing the Jacksonville fire code is a discretionary function for the City's Fire Marshal.

was clearly established at the time of the violation.[4]  Saucier, 533 U.S. at 201; Scott, 550 U.S.

at 377; Lee, 284 F.3d at 1194.  The court must undertake this second inquiry "in light of the

specific context of the case, not as a broad general proposition."  Saucier, 533 U.S. at 201.

### A.   Count One: Due Process

#### 1.   Do Plaintiffs Allege Facts that Establish a Constitutional Violation?

The standard for a constitutional violation under the Due Process Clause is well

known:

> There can be no doubt that, at a minimum, the Due Process Clause requires
> notice and the opportunity to be heard incident to the deprivation of life, liberty
> or property at the hands of the government. Mullane v. Central Hanover Bank
> & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950).
> And it is equally clear that the government must provide the requisite notice
> and opportunity for a hearing "at a meaningful time and in a meaningful
> manner," although in "extraordinary situations" the provision of notice and a
> hearing may be postponed until after the deprivation has occurred. Fuentes v.
> Shevin, 407 U.S. 67, 80, 90, 92 S.Ct. 1983, 1994, 1999, 32 L.Ed.2d 556
> (1972). If the government fails to comply with the dictates of the Due Process
> Clause, the aggrieved party can seek compensatory damages and equitable
> relief under 42 U.S.C. § 1983. McKinney v. Pate, 20 F.3d 1550, 1555, 1557
> (11th Cir. 1994) (en banc).

Grayden v. Rhodes, 345 F.3d 1225, 1232 (11th Cir. 2003).  To state a claim under § 1983

for denial of procedural due process, a plaintiff must allege: "(1) a deprivation of a

constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-

inadequate process."  Id. (citing Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994)).  In

this case, it is undisputed that Plaintiffs have sufficiently alleged the first two elements.

Plaintiffs enjoyed a constitutionally protected property interest in the operation of a bikini bar,

---

[4] In Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808 (2009), the Supreme Court modified the
procedure mandated in Saucier permitting trial judges the discretion to determine which prong of the
qualified immunity analysis should be resolved first.  See Pearson, 129 S.Ct. at 818.

see Complaint ¶¶ 9-10, and they were deprived of that interest when Jones closed the business and ordered the electric power terminated following the June 29, 2013 DART raid, see id. ¶¶ 28, 31-37. Whether Plaintiffs have alleged constitutionally-inadequate process turns on the notion of due process as a "flexible concept that varies with the particular circumstances of each case, and to determine the requirements of due process in a particular situation, [courts] must apply the balancing test articulated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)." Grayden, 345 F.3d at 1232-33. This test weighs several factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Zinermon v. Burch, 494 U.S. 113, 127 (1990) (quoting Mathews, 424 U.S. at 335) (internal quotation marks omitted). In applying this test, the Supreme Court has generally held that constitutional due process "requires some kind of a hearing before the State deprives a person of liberty or property." Id. However, in extraordinary situations "a statutory provision for a postdeprivation hearing, or a common-law tort remedy for erroneous deprivation, satisfies due process." Id. at 128; Grayden, 345 F.3d at 1232. These extraordinary situations have three characteristics:

> First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force; the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

<u>Fuentes</u>, 407 U.S. at 91.

In Count One of the Complaint, Plaintiffs allege both a facial and an as applied challenge to Chapter 420 of the JMOC and identify several deficiencies to this code provision which they contend violate the requirements of constitutional due process: (1) Chapter 420 gives Jones "unfettered discretion to order DART raids and issue emergency closure orders" without meaningful standards and necessary procedural safeguards; (2) Chapter 420 fails to provide adequate predeprivation process because it fails to provide for notice and a hearing before a closure order and termination of utility services; and (3) the legislation fails to provide adequate post-deprivation remedies because it does not provide for an immediate or effective post-deprivation hearing. <u>See generally</u> Complaint.

At the outset, it is worth noting that Plaintiffs' facial challenges to Chapter 420[5] are inappropriate to the extent Plaintiffs direct these allegations against Jones because "a facial challenge will succeed only if the statute 'could never be applied in a constitutional manner.'"[6] <u>Harris v. Mexican Specialty Foods, Inc.</u>, 564 F.3d 1301, 1308 (11th Cir. 2009) (citing <u>DA Mortgage, Inc. v. City of Miami Beach</u>, 486 F.3d 1254, 1262 (11th Cir. 2007)). Indeed, Plaintiffs present no argument or citation of authority supporting their claim of facial invalidity. Instead, in the Response, Plaintiffs assert that one of their "primary theories" is that Jones "violated Plaintiffs' due process rights by declaring an emergency on a pretextual basis, thereby avoiding the usual due process protections[.]" Response at 3-4. Specifically,

---

[5] In Count Two, Plaintiffs allege Chapter 420 is facially unconstitutional as a prior restraint on speech. <u>See</u> Complaint ¶ 178.

[6] In ruling on the Motion for Preliminary Injunction, the Court determined that with respect to the facial challenge in Count One of the Complaint, Plaintiffs failed to carry their burden of showing they had a substantial likelihood of success on the merits of the claim. <u>See</u> Hearing Transcript at 9.

Plaintiffs assert that "there were no exigent circumstances present which would support Jones' enforcement actions" and that "Jones manufactured a non-existent emergency specifically so that Plaintiffs would not be able to challenge his pretextual activity through meaningful hearings." Id. at 5. Additionally, Plaintiffs argue that "Jones' actions were part of a larger effort" through the City's DART program, "to thwart the rights of citizens operating disfavored bikini bars." Id. Plaintiffs also contend that "[t]he issue of qualified immunity for the individual Defendant does not turn on the facial challenges [to the City's procedure for addressing emergency closures], but rather, on Plaintiffs' claims that the enforcement was pretextual and content-based." Id. at 13 n.6. These arguments present only as applied claims.

The essence of Plaintiffs' claims against Jones is that since no exigent circumstances "really" existed at the time of the June 29, 2013 DART raid, Jones was not justified in closing the business and terminating the electrical service at the Silver Fox absent a predeprivation hearing.[7] Initially, the Court notes that "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated. Evidence concerning the defendant's subjective intent is simply irrelevant to that defense." Crawford-El v. Britton, 523 U.S. 574, 588 (1998). Indeed, in light of the "conflicting concerns" attendant to permitting damages suits against government officials, courts generally afford

---

[7] In ruling on the Motion for Preliminary Injunction, the Court determined that the absence of predeprivation process did "not appear to be a fatal constitutional flaw" given that the procedure under Chapter 420 is directly necessary to securing public safety, which courts have recognized is a paramount governmental interest. See Hearing Transcript at 17; see also Hodel v. Va. Surface Mining and Reclamation Ass'n, Inc., 452 U.S. 264, 300 (1981) ("Protection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action."). However, this determination is not conclusive for purposes of the instant Motion.

"governmental officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." Anderson v. Creighton, 483 U.S. 635, 638 (1987); see also Stanton v. Sims, 134 S.Ct. 3, 5 (2013) ("'Qualified immunity gives government officials breathing room to make reasonable mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'").  To that end, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in the light of legal rules that were 'clearly established' at the time it was taken[.]"  Anderson, 483 U.S. at 639.  Thus, to the extent Plaintiffs rely upon Jones's subjective motivation for the DART raid as the basis for their claim, such reliance is improper for purposes of determining whether Jones is entitled to qualified immunity.

Disregarding Plaintiffs' allegations concerning Jones's subjective intent, Plaintiffs' remaining allegations are insufficient to rebut a defense of qualified immunity.  In the Complaint, Plaintiffs allege that "[d]uring the early morning hours of Saturday, June 29, 2013, without prior notice to the Plaintiffs, the City of Jacksonville conducted a 'DART raid' on the subject property."  Complaint ¶ 28.  The DART raid "was conducted by numerous City employees including Fire Chief Jones, representatives from the City's Municipal Code Compliance Division, deputies with the Jacksonville Sheriff's Office, and one or more representative of JEA (Jacksonville Electric Authority)."  Id.  The City officials did not have a warrant to search the Silver Fox, did not request permission to enter the Silver Fox, and did not obtain consent to search the Silver Fox.  Id. ¶¶ 29-30. "After a cursory inspection of the

premises, Fire Chief Jones, issued four (4) Notices of Violation . . . under the authority of Chapters 420, 518, and 609 of the Jacksonville Code of Ordinances." Id. ¶¶ 31, 32; see also (Doc. 1-1, Exhibit A; Notice(s) of Violation).  The Notice of Violation numbered WFP-10608 includes a directive to "Cease and Desist business operation[,]" which "appears to be based on the lack of fire sprinklers in the building, which in turn was based on Jones' mistaken belief that the occupancy of the building exceeds 300 persons."  Complaint ¶¶ 33-34.[8]  Jones "followed up this written directive by ordering all of the patrons and employees off the property and threatened them with arrest if they reentered the property for any reason" and "then directed the representative of JEA to cut off the electricity to the premises and the representative did so."  Id. ¶¶ 35-36.

It is undisputed that Jones issued the closure/vacate order and terminated the electrical service without predeprivation process.  Thus, the question becomes whether Plaintiffs have alleged sufficient facts to demonstrate the lack of exigent circumstances which would render Jones's actions a violation of due process.  In support of their claim, Plaintiffs allege:

- "There were no exigent circumstances present which would justify the issuance of a vacate order or the termination of electric power to Plaintiffs' property without pre-deprivation notice and an opportunity to be heard[,]" id. ¶ 38;

- "The DART raid, closure order and termination of electric service were not based on an actual emergency or exigent threat to the health, safety and welfare of the community" and "[t]he failure to provide either pre-deprivation notice and an opportunity to be heard, or an immediate

---

[8] According to Plaintiffs, the occupancy of the building is, in fact, only 243 persons, an occupancy level at which the installation of fire sprinklers is not required.  Complaint ¶ 34.

hearing following a deprivation based on exigent circumstances, violates Plaintiffs' fundamental due process rights[,]" id. ¶¶ 56-57;

- "Plaintiffs' cause of action does not turn on whether violations did or did not exist on the premises," and "Jones was substantively wrong with respect to all or substantially all of his conclusions and that they are not well founded in law or fact[,]" id. ¶ 34.

Prior to Iqbal, Eleventh Circuit precedent instructed that a heightened pleading standard applied in § 1983 actions where "the defendants are individuals who may seek qualified immunity." See Amnesty Int'l, USA v. Battle, 559 F.3d 1170, 1179 (11th Cir. 2009). However, in Randall v. Scott, 610 F.3d 701 (11th Cir. 2010), the Eleventh Circuit determined that "[a]fter Iqbal it is clear that there is no 'heightened pleading standard' as it relates to cases governed by Rule 8(a)(2), including civil rights complaints." See Randall, 610 F.3d at 707-10. Nevertheless, here Plaintiffs' allegations are entirely too conclusory to establish the absence of exigent circumstances which would, in turn, render Jones's conduct unconstitutional. See Gonzalez, 325 F.3d at 1235 (finding the plaintiffs' "vague and conclusory allegations do not establish supervisory liability" where they simply "make bold statements and legal conclusions without alleging any facts to support them"); see also Bloom v. Miami-Dade Cnty., 816 F. Supp. 2d 1265, 1285 (S.D. Fla. 2011) (granting motion to dismiss on the basis of qualified immunity where the plaintiff failed to allege specific factual allegations to support her claims). Although Plaintiffs allege the absence of exigent circumstances, they fail to allege facts to support such a conclusion. Additionally, Plaintiffs' allegations that Jones was "mistaken" and "substantively wrong" regarding the fire code violations are inconsistent with their claim of a constitutional violation for purposes of overcoming qualified immunity. See Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997)

("[T]he qualified immunity standard is broad enough to cover some 'mistaken judgment[.]'"). Ultimately, Plaintiffs' allegations fail to establish that a reasonable officer in Jones's position would have known that his conduct was unconstitutional.  Accordingly, with respect to Count One, the Motion is due to be granted on the basis of qualified immunity.

### 2.   Was the Constitutional Violation Clearly Established at the Time of the DART Raid?

Even if Plaintiffs had pled sufficient facts to allege a constitutional violation, they have failed to demonstrate that the alleged due process violation was clearly established at the time of the DART raid.  Plaintiffs are correct in that "[d]ue process requires notice and the opportunity to be heard prior to a deprivation of property except where exigent circumstances exist." Response at 12.  However, Plaintiffs have failed to cite any cases demonstrating that based on the facts alleged, a reasonable official in Jones's position "would understand that what he is doing violates that right."  Hope v. Pelzer, 536 U.S. 730, 739 (2002).

Plaintiffs cite Barnes v. Zaccari, No. 7:12-cv-89 (HL), 2013 WL 3864306 (M.D. Ga. July 24, 2013), for the proposition that "[i]f the law imposes liability where a reasonable code enforcement officer would not find exigent circumstances, it certainly would impose liability where that officer intentionally avoids a due process hearing knowing that there is no factual basis for that decision."  Response at 14-15.  In Barnes, a university president had a student "administratively withdrawn[,]" an action which the student claimed violated his procedural due process rights.  2013 WL 3864306 at *1, *11.  In deciding the issue of qualified immunity, the court noted that in Goss v. Lopez, 419 U.S. 565 (1975), "the Supreme Court held that compliance with procedural due process rights in an emergency situation on a school campus 'cannot be insisted upon'" and that "'[s]tudents whose presence poses a continuing

danger to persons or property or an ongoing threat of disrupting the academic process may be immediately removed from school.'" Barnes,  2013 WL 3864306, at *6 (quoting Goss, 419 U.S. at 584).   However, because the president was unable to demonstrate a factual basis for his claim that there was an emergency situation on campus which warranted the knowing violation of the student's procedural due process rights, the court denied qualified immunity. Id. at *11.

Because Barnes involves procedural due process rights in the context of a school emergency, Plaintiffs' reliance upon the case unavailing.  "The Supreme Court has declared that the test of 'clearly established' law cannot apply at a high level of generality; instead, to deny qualified immunity, 'the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense.'"  Festa v. Santa Rosa Cnty. Fla., 413 F. App'x 182, 185 (11th Cir. 2011) (quoting Anderson, 483 U.S. at 640).  As such, Plaintiffs cannot rely upon the general proposition that predeprivation process is required in the absence of exigent circumstances to satisfy their burden of demonstrating the law was clearly established.  See, e.g., Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2084 (2011) ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established.").  A case involving procedural due process in the context of a university expulsion simply does not satisfy this standard.

Plaintiffs also cite Armendariz v. Penman, 75 F.3d 1311 (9th Cir. 1996), as an example of a "civil rights case[ ] involving rogue code enforcement officers[.]" Response 15. Like Barnes, Armendariz fails to provide a source of clearly established law for at least two

reasons.  First, in Armendariz, the Ninth Circuit Court of Appeals rejected the plaintiffs' claim

for violation of substantive due process, not procedural due process. 75 F.3d at 1318.  Next,

Armendariz is precedent in the Ninth Circuit,[9] not Eleventh Circuit, so even assuming the

case presented an analogous set of law and facts, this Court would not rely upon it to find the

law to be clearly established as to Jones.  See Jenkins by Hall v. Talladega City Bd. of Educ.,

115 F.3d 821, 826 n.4 (11th Cir. 1997) ("In this circuit, the law can be 'clearly established' for

qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit

Court of Appeals, or the highest court of the state where the case arose.").

Additionally, Plaintiffs rely upon Espanola Way Corp. v. Meyerson, 690 F.2d 827 (11th

Cir. 1982), for the proposition that "[t]he law has been well-established in the Eleventh Circuit

. . . that 'a conscious attempt to deprive property owners of property without due process of

law clearly contravenes established law.'" Response at 11 (citing Espanola Way, 690 F.2d

at 830).  Plaintiffs argue that "[t]he only real difference is the motivation behind the pretextual

code enforcement action: in Espanola Way the city objected to an influx of Cuban refugees,

while in this case Defendant objects to Plaintiffs' dance entertainment."  Response at 15.

However, as summarized by the Eleventh Circuit in a later case:

> In Espanola [Way], city officials were alleged to have formed and expressly
> ordered a task force to harass local hotels to drive the hotels out of business.
> Noting the sparse factual record (the district court proceedings took place
> before Harlow[ v. Fitzgerald, 457 U.S. 800 (1982)] was decided) and that
> defendants did not actually assert qualified immunity (although in a
> memorandum to the district court defendants did assert their good faith), we
> decided the officials were not due summary judgment for losses that resulted

_____

[9] The Supreme Court in Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 532 (2005) "undermined"
Armendariz to a limited, albeit unrelated, extent.  See Crown Point Dev., Inc. v. City of Sun Valley, 506
F.3d 851, 852-53 (9th Cir. 2007).

when the task force issued over 300 plainly unwarranted building and fire code violations to one hotel.

Post v. City of Fort Lauderdale, 7 F.3d 1552, 1560 (11th Cir. 1993) modified, 14 F.3d 583

(11th Cir. 1994).  In contrast, in Post, a case involving the City of Ft. Lauderdale's "max cap"

code enforcement proceedings against a local restaurant, the Eleventh Circuit explained:

> We have a different record in this case. The code team's acts were not plainly unwarranted. From what plaintiffs have said, a code team could have reasonably believed that the max cap notices were justified. And, someone like [the police officer-defendant] could have reasonably believed he could arrest [the plaintiff-restaurant owner] because [the restaurant] was still over the max cap after having received three notices in a row. Plaintiffs claim defendants deliberately used the code team to try to ruin [the restaurant owner]. Even if this subjective motivation were true, no facts show the code team's objective conduct in inspecting for violations, issuing citations, or making arrests was plainly unjustified. Cf. United States v. Edenfield, 995 F.2d 197 (11th Cir.1993) (whether police violated due process turns on evidence of "outrageous misconduct," not evidence of officer's motive for investigating defendants).

Id.  The instant case is more analogous to Post than Espanola Way.  Like the code team's

acts in Post, which were not, objectively speaking, plainly unwarranted, Plaintiffs have failed

to allege specific facts showing the lack of exigent circumstances which would render Jones's

actions unconstitutional.[10]  Although Plaintiffs contend Espanola Way supports their theory

---

[10] In addition, false arrest cases granting qualified immunity based on "arguable probable cause" provide a useful lens through which to address this issue.  See Poulakis v. Rogers, 341 F. App'x 523 (11th Cir. 2009); Eloy v. Guillot, 289 F. App'x 339 (11th Cir. 2008); Hawthorne v. Sheriff of Broward Cnty., 212 F. App'x 943 (11th Cir. 2007).  Beginning with the basic proposition that "[a] warrantless arrest without probable cause violates the Constitution[,]" the Eleventh Circuit has held that "even if an officer arrests an individual without probable cause in violation of the Constitution, this does not automatically strip the officer of qualified immunity protection."  Poulakis, 341 F. App'x at 526.  Rather, in wrongful arrest cases, courts have said that "when an officer violates the Constitution because he lacked probable cause to make an arrest, the officer's conduct may still be insulated under the second prong of qualified immunity if he had 'arguable probable cause' to make the arrest."  Id. "Arguable probable cause exists where an objectively reasonable officer in the same circumstances and possessing the same knowledge as the officers effectuating the arrest could have believed that probable cause existed."  Hawthorne, 212 F. App'x at 946.

In the instant case, Jones acted under Chapter 420 of the JMOC, which provides that "existing conditions not in strict compliance with the terms of this Code shall be permitted to continue where the

(continued...)

that because Jones's code enforcement actions were pretextual, he is not entitled to sovereign immunity, this argument is unavailing.  As discussed above, any inquiry into Jones's subjective motivations is inappropriate for purposes of determining qualified immunity.  As such, even if Jones was "mistaken" with respect to the occupancy and the need for sprinklers as Plaintiffs allege, he is entitled to qualified immunity as to Count One for the additional reason that Plaintiffs have failed to allege a violation of clearly established law.

**B.     Counts Two and Three: First Amendment Prior Restraint and Content-Based Discrimination**

**1.     Do Plaintiffs Allege Facts that Establish a Constitutional Violation?**

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys."  Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828 (1995) (citing Police Dep't of Chicago v. Mosley, 408 U.S. 92, 96 (1972)).  Additionally, nude or erotic dancing like that at issue in the instant case has been called "expressive conduct within the outer perimeters of the First Amendment[,]" albeit "only marginally so."  Barnes v. Glen Theatre, Inc., 501 U.S. 560, 566 (1991).  Nevertheless, as with Plaintiffs' due process claim, the Court finds that Plaintiffs have failed to bear their burden of alleging facts that establish a First Amendment violation by Jones.

_____

[10](...continued)
exceptions do not constitute a distinct hazard to life or property in the opinion of the Chief, Fire Prevention," and Chapter 518 of the JMOC, which authorizes a vacate order, closure, and termination of electrical services in the case of an emergency. See JMOC §§ 420.102, 518.151.  A reasonable Fire Marshal who believed an establishment like the Silver Fox was over capacity and lacking required sprinkler systems and fire alarms would be justified in acting under Chapters 420 and 518.  Thus, even assuming Jones was "substantively wrong" with respect to these fire code violations, Plaintiffs have failed to establish that Jones's actions went beyond what an objectively reasonable officer would have done in that same situation.

-19-

In Count Two of the Complaint, Plaintiffs assert that "Chapter 420 . . . has been applied in such a manner as to intentionally deprive Plaintiffs' [sic] of their First Amendment rights by creating a prior restraint." Complaint ¶ 179.[11] In Count Three, Plaintiffs assert that "Defendants have employed Chapters 420 and 518 against Plaintiffs in an intentionally discriminatory fashion because Defendants object to the content of Plaintiffs' speech." Id. ¶ 204. Additionally, in both Counts, Plaintiffs allege that "[r]eliance on Chapters 420 and 518 as the basis for Defendants' DART raids and emergency closure orders is entirely pretextual" because "Defendants know that there are no serious code violations at any of the Jacksonville bikini bars[,] Defendants also know that Plaintiffs' business does not pose an immediate threat to the health, safety or welfare of the community[,]" and "[t]he raids and closure Orders were motivated entirely by an intent to harass Plaintiffs, and other bikini bars, and deny them their right of free speech." Id. ¶¶ 191, 217.[12] Instead, despite the inclusion of the prior restraint claim in the Complaint, in the Response, Plaintiffs state that their "primary theor[y]" is that Jones "violated Plaintiffs' First Amendment rights by closing its business on pretextual grounds because of Defendant's objections to the content of Plaintiff's speech." Response at 3-4. As such, Plaintiffs appear to have abandoned the prior restraint claim.

Nevertheless, and perhaps in an abundance of caution, the Court again questions whether the First Amendment is actually implicated in this case. At the hearing on Plaintiffs'

---

[11] Plaintiffs also allege that the "prior restraint is both created and removed in the sole discretion of Jones" and that this "discretion has been intentionally abused with the purpose and effect of depriving Plaintiffs of their First Amendment rights." Complaint ¶ 179.

[12] In the Response, Plaintiffs address their claims in Count Three of the Complaint (content-based discrimination) but do not discuss their claims in Count Two (prior restraint).

Motion for Preliminary Injunction, the Court found that Plaintiffs had failed to demonstrate a substantial likelihood of success on the merits of their facial challenge to Chapter 420 as a prior restraint.  See Hearing Transcript at 21-23.  In reaching this conclusion, the Court pointed to Arcara v. Cloud Books, Inc., 478 U.S. 697 (1986), in which the respondents challenged police action in seeking closure of a bookstore due to alleged solicitation of prostitution on the premises.  The Arcara Court held that the First Amendment was "not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books."  Arcara, 478 U.S. at 707. Similarly, in the instant case, the Court noted that "the alleged fire code violations . . . have nothing to do with the expressive conduct."  See Hearing Transcript at 22.  Thus, Plaintiffs may not "claim special protection from governmental regulations of general applicability simply by virtue of their First Amendment protected activities."  Arcara, 478 U.S. at 705. Further, at the hearing on Plaintiffs' Motion for Preliminary Injunction, the Court rejected Plaintiffs' facial challenge to Chapter 420 as a prior restraint relying, once again, upon Arcara. See Hearing Transcript at 22-23.  In Arcara, the Court determined that the closure order was distinguishable from a prior restraint because the (1) "the order would impose no restraint at all on the dissemination of particular materials, since respondents are free to carry on their bookselling business at another location, even if such locations are difficult to find" and (2) "the closure order has nothing to do with any expressive conduct at all."  Arcara, 478 U.S. at 705 n.2.  As noted at the preliminary injunction hearing, these rationales are "equally applicable" in the instant case.  See Hearing Transcript at 23.

-21-

Additionally, with respect to Count Three, it appears that Plaintiffs have failed to allege a First Amendment violation by Jones which rebuts his defense of qualified immunity. As with their due process claim, Plaintiffs improperly rely upon Jones's subjective motivation in an effort to rebut the defense of qualified immunity. See Crawford-El, 523 U.S. at 588. Therefore, to the extent Plaintiffs assert that Jones was improperly motivated by the content of Plaintiffs' expressive activity in taking enforcement action under Chapter 420, this argument is unavailing. Additionally, to the extent Plaintiffs assert that Jones's subjective motivation in acting under Chapter 420 constituted his use of this provision as an impermissible prior restraint, this argument is similarly unpersuasive. Plaintiffs' allegations fail to allege any action by Jones that either implicates the First Amendment or which may form the basis of a constitutional violation for purposes of rebutting a defense of qualified immunity. As such, Jones is entitled to qualified immunity as to Counts Two and Three.

### 2. Was the Constitutional Violation Clearly Established at the Time of the DART raid?

Plaintiffs have also failed to carry their burden of showing that Jones's alleged First Amendment violation was clearly established at the time of the DART raid. Plaintiffs argue that they properly "assert that Jones' participation in the harassment has been knowing and intentional and that he utilized code enforcement proceedings as a means of punishing Plaintiffs for the exercise of their First Amendment rights" and that "[t]he Courts in this Circuit routinely deny claims of qualified immunity where government officials are alleged to have intentionally discriminated against speakers or particular speech for content-based reasons." Response at 18. However, the cases cited by Plaintiffs are too factually distinct to demonstrate, given the facts alleged in the Complaint, that a reasonable official in Jones's

position would understand that his actions violated Plaintiffs' First Amendment rights. <u>See</u> <u>Hope</u>, 536 U.S. at 739.

In support of their argument, Plaintiffs cite four cases: <u>Bennett v. Hendrix</u>, 423 F.3d 1247 (11th Cir. 2005), a case in which the Eleventh Circuit considered whether the Forsyth County, Georgia Sheriff and other Sheriff's Department officers were entitled to qualified immunity based upon the plaintiffs' claim of retaliation in violation of their First Amendment rights, <u>id.</u> at 1248-50; <u>Cooper v. Smith</u>, 89 F.3d 761 (11th Cir. 1996), a case in which the Eleventh Circuit determined "whether a public official who terminates an employee for cooperating with law enforcement investigators is entitled to qualified immunity," <u>id.</u> at 765; <u>Camp v. Correctional Med. Servs., Inc.</u>, 400 F. App'x 519 (11th Cir. 2010), a case involving a First Amendment retaliation claim by a public employee, <u>id.</u> at 520; and <u>Amnesty Int'l, USA</u> <u>v. Battle</u>, 559 F.3d 1170 (11th Cir. 2009), a case involving claims of unreasonable police interference with the plaintiffs' right to be heard and to distribute pamphlets without unreasonable police interference in violation of the First Amendment, <u>id.</u> at 1174. Indeed, all of these cases involve claims under the First Amendment. However, none of these cases constitutes "existing precedent" which would place the "constitutional question" at issue in the instant case "beyond dispute." <u>See</u> <u>Ashcroft</u>, 131 S.Ct. at 2083. Last, Plaintiffs again cite <u>Barnes v. Zaccari</u>, No. 7:12-cv-89 (HL), 2013 WL 3864306 (M.D. Ga. July 24, 2013). Yet, the district court in <u>Barnes</u> did not address the merits of the plaintiff's First Amendment claim, <u>see</u> <u>generally</u> <u>Barnes</u>, so this case also fails as a source of clearly established law to support Plaintiffs' First Amendment claims. As such, the Court will grant the Motion as to Counts Two

and Three on the basis of qualified immunity for the additional reason that Plaintiffs have failed to allege a violation of a clearly established right.

### C.     Count Four: Equal Protection

In Count Four of the Complaint, Plaintiffs assert that Defendants violated their constitutional right to equal protection.  Plaintiffs do not address this claim in the Response, and thus, appear to have abandoned it.  See generally Response.  Nevertheless, in an abundance of caution, the Court will address the claim.

Plaintiffs contend that Defendants do not take "proactive action" or use DART raids against other commercial establishments in Jacksonville that offer live entertainment (like bands, deejays, and stage shows).   Complaint ¶¶ 232, 235-236.   Rather, for such establishments, Defendants use "normal" code enforcement procedures, which allow for notice and a hearing before final administrative action.  Id. ¶ 236.  However, with Plaintiffs' businesses and other bikini bars, Defendants use DART raids and issue closure orders "because they object to the content of the[] speech and wish to censor and eliminate sexually explicit communications in Jacksonville."  Id. ¶ 237.   Thus, according to Plaintiffs, "Defendants punish Plaintiffs, and other similarly situated bikini bars, and selectively enforce the laws against them in order to retaliate against them for exercising their fundamental constitutional rights."[13]  Id. ¶ 238.  Further, Plaintiffs allege that "Defendants selectively enforced the City's code enforcement laws and procedures against the Plaintiffs in violation of Plaintiffs' right of Equal Protection."  Id. ¶ 241.

---

[13] Presumably, Plaintiffs are referencing their First Amendment right to free speech.  See Complaint ¶ 239 ("[A]n entire category of speech is simply prohibited by the administrative enforcement of Chapters 420 and 518.").

The Fourteenth Amendment to the United States Constitution provides, in pertinent part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, §1.  This clause is commonly referred to as the equal protection clause and "is essentially a direction that all persons similarly situated should be treated alike." Alamo Rent-A-Car, Inc. v. Sarasota-Manatee Airport Auth., 825 F.2d 367, 369 (11th Cir. 1987); see also Vill. of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (explaining that "the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents" (internal quotation marks omitted)); Campbell v. Rainbow City, Ala., 434 F.3d 1306, 1313 (11th Cir. 2006).  Thus, "[d]ifferent treatment of dissimilarly situated persons does not violate the equal protection clause." E & T Realty v. Strickland, 830 F.2d 1107, 1109 (11th Cir. 1987); Campbell, 434 F.3d at 1314.

"Equal protection claims are not limited to individuals discriminated against based on their membership in a vulnerable class." Campbell, 434 F.3d at 1313.  Instead, they arise from an individual's right not to be subjected to intentional discrimination at the hands of the government.  See id. at 1313-14.  When a challenged classification does not burden fundamental personal rights or is not based on inherently suspect distinctions, such as race, religion, or alienage, the Court presumes "the constitutionality of the statutory discriminations and require[s] only that the classification challenged be rationally related to a legitimate state interest." City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976); see also Williams v.

Pryor, 240 F.3d 944, 948 (11th Cir. 2001).  The Court's review is highly deferential and "rational distinctions may be made with substantially less than mathematical exactitude." Dukes, 427 U.S. at 303; see also Williams, 240 F.3d at 948 (recognizing that "[a]lmost every statute subject to the very deferential rational basis scrutiny standard is found to be constitutional"); Alamo Rent-A-Car, Inc., 825 F.2d at 370 (acknowledging that the government has "wide latitude in enacting social and economic legislation").  Indeed, the Supreme Court has warned that "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines."  Dukes, 427 U.S. at 303.  Likewise, the Eleventh Circuit has opined that "[a] statute is constitutional under rational basis scrutiny so long as 'there is any reasonably conceivable state of facts that could provide a rational basis for the' statute." Williams, 240 F.3d at 948 (emphasis omitted); see also id. at 952; Parrish v. Consol. City of Jacksonville, No. 3:04-cv-986-J-32HTS, 2005 WL 1500894, at *3 (M.D. Fla. June 22, 2005).  "[I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." Dukes, 427 U.S. at 303-04 (citing Ferguson v. Skrupa, 372 U.S. 726, 732 (1963)).

When a classification is subject to rational basis scrutiny, the plaintiff bears "the burden to negative every conceivable basis which might support it." Williams, 240 F.3d at 948 (internal quotation marks and emphasis omitted); see also Hope for Families & Cmty. Serv., Inc. v. Warren, No. 3:06-cv-1113-WKW, 2008 WL 630469, at *9 (M.D. Ala. Mar. 5, 2008); Parrish, 2005 WL 1500894, at *3 (recognizing that "a state or local government whose law is being challenged does not have to produce evidence to sustain its rationale; rather,

'the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, . . . whether or not the basis has a foundation in the record'"). The rational basis identified need not be the reason that actually motivated the legislature to enact the statute.  See Williams, 240 F.3d at 948 (finding that "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"); see also Alamo Rent-A-Car, Inc., 825 F.2d at 372 (finding that, if the justification for the law is at least debatable, then there is no violation of the equal protection clause).  Nonetheless, even though rational basis review affords statutes a strong presumption of validity, "it is not toothless." Hope for Families, 2008 WL 630469, at *9 (citing Mathews v. Lucas, 427 U.S. 495, 510 (1976)).  The plaintiff can establish an equal protection violation if there is no legitimate purpose for the regulation or "the means used are not a reasonable way to accomplish the goal." Id. (citing W. & S. Life Ins. Co. v. State Bd. of Equalization of Cal., 451 U.S. 648, 668 (1981)).

The Eleventh Circuit has recognized that generally there are three types of equal protection claims.[14]  See E & T Realty, 830 F.2d at 1112 n.5.  The first type is "a claim that a statute discriminates on its face." Id.  To prevail on this type of claim, the plaintiff must show "that there is no rational relationship between the statutory classification and a legitimate state goal." Id.  The second type of claim is "that neutral application of a facially neutral statute has a disparate impact." Id. at 1112.  This claim requires that the plaintiff prove purposeful discrimination.  See id.  The third type of claim is "that defendants are

---

[14] These claims assume that there is no allegation of a classification requiring heightened scrutiny, such as a classification based on race or religion.

unequally administering a facially neutral statute." Id. Indeed, the Supreme Court also has recognized that a successful equal protection claim may be brought by a "class of one."[15] Olech, 528 U.S. at 564. This claim requires that "the plaintiff allege[] that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Id.; see also Campbell, 434 F.3d at 1314; E & T Realty, 830 F.2d at 1112-13.

Here, it appears that Plaintiffs assert the third type of equal protection claim by alleging Defendants are using Chapters 420 and 518 and DART raids in a "proactive" manner against bikini bars, like the Silver Fox, while using "normal" code enforcement process against other commercial establishments. See E & T Realty, 830 F.2d at 1112. "Unequal administration of facially neutral legislation can result from . . . selective enforcement (i.e., correct enforcement in only a fraction of cases)." Id. at 1113. However, "'[t]he unlawful administration by state officers of a state statute fair on its face, resulting in unequal application to those who are entitled to be treated alike is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.'" Id. at 1112-13.

In addressing Plaintiffs' equal protection claim, the Court notes that in Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court permitted trial judges to exercise their discretion in deciding which prong of the qualified immunity analysis to first address. See

---

[15] While the Supreme Court referred to this type of claim as a "class of one" claim, it concluded "that the number of individuals in a class is immaterial for equal protection analysis." Olech, 528 U.S. at 564. Instead, this type of claim relates to the allegations that the plaintiff or plaintiffs have been treated differently than others similarly situated and there is no rational basis for the disparate treatment. See id.

Corey Airport Servs., Inc. v. Decosta, 587 F.3d 1280, 1286 (11th Cir. 2009) ("Because we conclude examination of the clearly established law question will 'best facilitate the fair and efficient disposition' of this case, we consider only this prong of the qualified immunity analysis. We do not reach the question whether [the plaintiff] has presented sufficient evidence to show a constitutional violation."). Here, the Court elects to address the second prong - the existence of a clearly established right - first.  In doing so, the Court begins by noting that because Plaintiffs entirely failed to address their equal protection claim in the Response, Plaintiffs failed to meet their burden of establishing that Jones violated a clearly established constitutional right.

Nevertheless, had Plaintiffs addressed the claim, they would have faced an uphill battle.  A "court's recitation of the highly general principle - that unequal application of facially neutral law with the intent to discriminate may violate the equal protection clause - in and of itself" does not offer Jones "fair warning" that his treatment of Plaintiffs was unconstitutional. See Corey Airport Servs., Inc., 587 F.3d at 1287.  "For general principles to clearly establish the law, the case must be an obvious one." Id.  However, because "'most judicial precedents are tied to particularized facts,' broad principles of law are generally insufficient to clearly establish constitutional rights and '[courts] must look to precedent that is factually similar to the case at hand.'" Id. (quoting Williams v. Consol. City of Jacksonville, 341 F.3d 1261, 1270 (11th Cir. 2003)) (internal citation omitted).  Here, Plaintiffs' claim of intentional discrimination through "proactive" code enforcement based on the "sexually explicit" aspects of Plaintiffs' business in violation of equal protection presents a novel set of facts and a novel question of law.  See id. (stating that the plaintiff's "claims of insider-outsider political discrimination

present not only novel factual circumstances, but also a novel question of law"); see also Parks v. City of Warner Robins, Ga., 841 F. Supp. 1205, 1208-09, 1210 (M.D. Ga. 1994) (granting defendants' motion for summary judgment based on qualified immunity because "[a]lthough plaintiff is not required to produce a case squarely on point in order for this court to ultimately hold the [city's anti-nepotism] policy in violation of [the plaintiff's constitutional rights of association, procedural and substantive due process, and equal protection], the lack of decisions in this area of the law indicate the novelty of its application").

One case, 2025 Emery Highway, L.L.C. v. Bibb Cnty., Ga., 377 F. Supp. 2d 1310 (M.D. Ga. 2005), appears to present an analogous set of claims.  There, the plaintiff, an adult entertainment establishment known as Club Exotica, sued Bibb County alleging, among other things, that the county, through its sheriff, had "unconstitutionally targeted Club Exotica for investigation based upon an animosity towards nude dance entertainment and with the intent to chill the protected expression of its dancers" and had "treated Club Exotica differently than similarly situated businesses" in violation of the equal protection clause.  Id. at 1346-47. Despite this factual and legal similarity, 2025 Emery Highway does not constitute a source of clearly established law for purposes of determining qualified immunity.  First, the court in that case determined that the plaintiff's equal protection claim was barred by res judicata and, alternatively, that the defendants' motion for summary judgment was due to be granted because the plaintiff had failed to establish that Club Exotica was treated differently than other similarly situated venues.  Id. at 1349; see also Corey Airport Servs., Inc., 587 F.3d at 1286 (finding unpersuasive plaintiff's cited cases for purposes of determining qualified immunity "[b]ecause the circumstances [of the plaintiff's case] differ[ed] from the

circumstances of the cited cases and because the courts in the cited cases did not hold that the defendants violated the Constitution").  Further, 2025 Emery Highway was decided by a district court, and in the Eleventh Circuit "the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, [the] Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins by Hall, 115 F.3d at 826 n.4.  As such, Plaintiffs have failed to rebut Jones's defense of qualified immunity, and the Motion is due to be granted as to Count Four.

## IV.    Conclusion

For the foregoing reasons, Defendant's Motion is due to be granted.  It is undisputed that Jones was acting within his discretionary authority.  However, because Plaintiffs do not address their prior restraint and equal protection claims in the Response opposing Defendant's Motion, Counts Two and Four of the Complaint should be dismissed as abandoned as to Defendant Jones.[16]   Additionally, with regard to their due process and content-based discrimination claims, Plaintiffs have failed to allege constitutional violations of clearly established law in order to rebut Defendant's defense of qualified immunity. Accordingly, Counts One and Three should also be dismissed as to Defendant Jones on the grounds of qualified immunity.

---

[16] Additionally, for the reasons stated, Jones is entitled to qualified immunity as to these claims.

Accordingly, it is

**ORDERED**:

1.      Defendant, Kevin L. Jones's, Motion to Dismiss Individual Claims with Prejudice (Doc. 18) is **GRANTED**.

2.      Counts One, Two, Three, and Four of the Complaint are **DISMISSED** as to Defendant Kevin L. Jones.

2.      The Clerk of the Court is **DIRECTED** to terminate Defendant Kevin L. Jones from the Court docket.

**DONE and ORDERED** at Jacksonville, Florida, this 11th day of September, 2014.

**MARCIA MORALES HOWARD**
United States District Judge

lc18

Copies to:

Counsel of Record